Joshua M. Lurie, Esq. (0788)
Lurie|Strupinsky, LLP
15 Warren Street, Suite 36
Hackensack, New Jersey 07601
Ph. 201-518-9999
Fax. 347-772-3074
Attorneys for Plaintiff

| | |
|---|---|
| ALLEXIS LICCIARDI,<br><br>       Plaintiff,<br><br>vs.<br><br>JFK MEDICAL ASSOCIATES P.A.; PRIMECARE MEDICAL GROUP, P.A.; PAUL BLUM, M.D.; THERMIVA CARE OF NJ, LLC; BHUDEV SHARMA, M.D.; JOHN AND JANE DOES 1-20 (Fictitious Names Representing the Owners, Operators or Others with Controlling Interests in Defendants JFK Medical Associates, P.A., Primecare Medical Group, P.A., Paul Blum, M.D., Thermiva Care of NJ, LLC, and/or Bhudev Sharma, M.D.); BUSINESS ENTITIES A-J (Fictitious Names Representing any Commercial or Business Entities that are the Owners, Operators, or Others with Controlling Interests in Defendants JFK Medical Associates, P.A., Primecare Medical Group, P.A., Paul Blum, M.D., Thermiva Care of NJ, LLC, and/or Bhudev Sharma, M.D.),<br><br>       Defendants. | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY<br><br>Civil Case No.:<br><br>CIVIL ACTION<br><br>**VERIFIED COMPLAINT AND DESIGNATION OF TRIAL COUNSEL** |

Plaintiff, Allexis Licciardi, by way of Verified Complaint against the Defendants, says:

## **PRELIMINARY STATEMENT OF THE CASE**

1.      This is a matter related to a scheme, mainly perpetuated by Defendant Paul Blum, M.D., a physician, to take advantage of his employee, Plaintiff, Allexis Licciardi, in multiple different ways.

2.     The bulk of the conduct relates to a continual, willful, scheme by Blum to, effectively, groom Plaintiff for his own sexual gratification and control all aspects of her life – including her health, income, and ability to work.

3.     As discussed in this complaint, the conduct of Blum became beyond reproach when he sexually assaulted Plaintiff by grabbing her breast during a medical exam that he performed and which he demanded she take before she was permitted to leave work for an illness. Thereafter, apparently believing that he could act with impunity, Blum began making sexually suggestive commentary to Plaintiff, including advising of his self-sexual gratification based upon his stalking of Plaintiff outside of work.

4.     When Plaintiff complained to management, not only was nothing done, but she suffered from retaliation at the workplace and was told by management that she should quit and find another job.

5.     Concurrently with the impropriety of Dr. Blum as to his sexual harassment of Plaintiff, all Defendants worked in conjunction to misclassify Plaintiff as an exempt manager and failed to pay her overtime notwithstanding that she was not a manager or exempt employee pursuant to the law.

**PARTIES**

6.     Plaintiff, Allexis Licciardi ("Licciardi") is an individual who resides in Middlesex County, New Jersey.

7.     During the relevant time period, Plaintiff was and is a young woman who was interested in developing a career in any field.

8.     Concurrently, Plaintiff was also involved and interested in becoming further involved in the adult entertainment industry.

9.     Defendant JFK Medical Associates, P.A. ("JFK Associates") is, upon information and belief, a New Jersey Professional Association with several locations across New Jersey, including New Brunswick, Edison, and Old Bridge.

10.     On information and belief, JFK Associates employs approximately fifty (50) physicians, hundreds of staff members, and cover seventeen (17) specialty areas of medicine.

11.     Defendant JFK Associates is a business entity engaged in commerce as set forth under the FLSA and, upon information and belief, has annual gross revenues in excess of $500,000.00.

12.     Defendant Primecare Medical Group, P.A. ("Primecare") is, upon information and belief, a New Jersey professional association and, upon information and belief, is owned or affiliated with with JFK Associates as one of its medical practice providers.

13.     Upon information and belief, Primecare's principal place of business is located in Edison, New Jersey.

14.     Defendant Primecare is a business entity engaged in commerce as set forth under the FLSA and, upon information and belief, has annual gross revenues in excess of $500,00.00.

15.     Defendant Paul Blum, M.D. ("Blum") is a registered physician and internal medicine specialist located in Edison, New Jersey.

16.     Upon information and belief, Blum, for all relevant times, was employed by Primecare which, in turn, is either owned by or is a member of JFK Associates.

17.     Defendant Blum is an employer as defined pursuant to the FLSA as to Plaintiff.

18.     Defendant Blum was Plaintiff's direct supervisor and worked with her from day to day.

19.     Defendant Thermiva Care of New Jersey ("Thermiva Care") is, upon information and belief, a New Jersey Limited Liability Company owned and operated by Defendant Blum, which specializes in two non-invasive treatments: 'Thermi-Smooth' and 'Thermiva'.

20.     Defendant Thermiva Care of New Jersey is a business entity engaged in commerce as set forth under the FLSA and, upon information and belief, has annual gross revenues in excess of $500,000.00.

21.     Defendant Bhudev Sharma, M.D. ("Sharma") is a registered physician specializing in cardiovascular disease and internal medicine located in Edison, New Jersey. He is, upon information and belief, the principal of Defendant Primecare.

22.     The John Does and Business Entity defendants are fictitious parties identified as such because their identities are not known at this time and who may be liable to the Plaintiff for the damages and harms as set forth herein such that an amended complaint would be necessary.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this matter involves violations of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. (FLSA). As to claims under New Jersey State Law, this Court has supplemental subject matter jurisdiction over the pendant state law and common law claims pursuant to 28 U.S.C. § 1367 as those claims are so intertwined with those claims to which the Court has original jurisdiction.

24.     Venue is proper in this District under 28 U.S.C. § 1391 (b) and (c) because a substantial part of the acts or omissions giving rise to this action occurred in this District and Defendants are subject to personal jurisdiction in this District.

## FACTS RELEVANT TO ALL CLAIMS

25.     In early 2017, Plaintiff responded to an advertisement for a medical office receptionist.

26.     In early 2017, Plaintiff had an interview with Defendant Blum who represented that he would be her principal employer at the job.

27.     During the interview, Plaintiff felt a bit confused by the awkward nature thereof and some of the commentary of Defendant Blum. For example, he mentioned that he had looked her up online, knew what she looked like, and Plaintiff began to get the impression that at least a part of the decision to offer her an interview was predicated upon whatever information Defendant Blum found from online. This included some concern that he may have stumbled across some more embarrassing information from online, including her involvement in the adult entertainment industry.

28.     Notwithstanding, because she believed that it would be a good fit for the job to which she interviewed, when offered the job as a full-time medical office receptionist, Plaintiff accepted.

29.     The job offer was made by Defendant Blum and Plaintiff understood him to be her supervisor.  Indeed, as discussed below, Blum was her supervisor and principal employer.

## FACTS RELEVANT TO PLAINTIFF'S RETENTION AND JOB DUTIES

30.     Plaintiff began working for Defendants Blum and JFK Associates on or about April 27, 2017.

31.     At the inception of her employment, Plaintiff's work schedule was Mondays and Wednesdays from 8:00 a.m. to 6:00 p.m., and Tuesdays, Thursdays, and Fridays from 8:00 a.m. to 2:00 p.m.

32.     While the office was not open to patients on Fridays, Plaintiff was still directed and required to go to work to perform other office and administrative tasks.

33.     Similarly, at the inception of her employment, Plaintiff worked solely with Defendant Blum and, at the time, the office manager named Frannie Iannule.

34.     After a week of Plaintiff's employment, Ms. Iannule was terminated for reasons to which Plaintiff is not aware.

35.     After Ms. Iannule's termination, Plaintiff was promoted to office manager and received a raise. Her hours were to remain the same and her pay increased to $17 per hour, and every three months she would be given a bonus of $3 per hour for every hour she worked for the past three months.

36.     The position as office manager was largely illusory. Plaintiff had no true management duties. Indeed:

   a.  Her principal duties were not the management or oversight of the office and was more of an office administrator or generalist and was typically the only employee in the office other than the doctor;

   b.  she did not customarily direct the work of at least two other employees. There was no other employees until much later, as discussed below, were a single other employee was hired;

   c.  She had no say at all in the hiring or firing of employees; and

   d.  She had no discretionary powers. Rather, she was to perform whatever task to which Dr. Blum told her to do at any given time.

37.     As an office manager, Plaintiff received sick, personal, and vacation time.

38.     However, due to Defendant Blum's controlling nature and conduct, as discussed below, Plaintiff was not permitted to utilize any of this time.

## FACTS RELEVANT TO THERMIVA CARE OF NEW JERSEY

39.     In addition to the above, after being employed by Defendant JFK for a short period of time, Plaintiff learned that Defendant Blum simultaneously ran his own business, Defendant Thermiva Care of New Jersey, out of JFK's offices – apparently without the knowledge or consent of JFK and/or Primecare.

40.     Through Thermiva Care, Defendant Blum performed two (2) non-invasive procedures within his office. The first is called 'Thermi-Smooth' and the second is called 'Thermiva'.

41.     After her promotion to office manager, Plaintiff was directed by Defendant Blum to assist in these procedures when needed. Defendant Blum stated he would pay Plaintiff anywhere between $18-$20 per procedure (which typically lased about an hour) directly and not through Plaintiff's actual legal employer. Blum also directed Plaintiff not to speak or give any information to any employees from Defendant Sharma's office or from Defendants Primecare or JFK Associates.

42.     The second procedure including an invasive insertion of a device into a patients' vagina for the alleged purpose of "vaginal tightening." However, it became clear to Plaintiff that Dr. Blum's providing of this service was not for the patients' benefits and it appeared that he was obtaining sexual gratification from performing this work on these patients. At certain times, it appeared that Dr. Blum was not attempting to perform the actual treatment and was attempting to give his patients orgasms.

43.     Plaintiff witnesses many of these women providing confused looks during the procedures and their acting mentally uncomfortable after the "treatment."

44.     Frequently after a "Termiva" patient finished, Dr. Blum would then go into his office for extended periods of time.

45.     As a result of this, Plaintiff was never able to finish work on time. She consistently met and exceeded forty-hour workweeks. Despite being given a thirty (30) minute lunchbreak, she was never allowed to take it.

## PLAINTIFF IS MISCLASSIFIED AS AN EXEMPT EMPLOYEE TO AVOID PAYING OVERTIME PAY

46.     Due to her consistent overtime, after approximately three months of working for Defendant Blum, he advised Plaintiff that he was changing Plaintiff from being paid on an hourly basis to a salaried employee.

47.     Defendant Blum stated that he could no longer afford to pay Plaintiff an hourly rate, as she was making too much overtime. Plaintiff's accumulation of overtime was caused by Defendant Blum refusing to hire any additional staff and directing Plaintiff to work his side-job with him at Thermiva.

48.     Plaintiff brought up the issue of her pay rate to Defendant Primecare's accountant, Marilyn, via both email and by telephone as she was responsible for, upon information and belief, all "onboarding and offboarding" of employees.

49.     Marylin was unable or unwilling to rectify the issue with pay.

50.     Plaintiff asked countless times to be switched back to her agreed upon hiring rate of pay (hourly) as the switch to being paid at a salary significantly reduced her weekly take-home pay. At that time, Plaintiff was working approximately between six to ten hours of overtime per week which would convert into between $153.00 and $255.00 per week (or between approximately $7,650.00 and $13,260.00 in overtime pay per annum).

51.     Knowing fully well that her overtime was not due to her work for JFK Associates, Defendant Blum continued to take full advantage of Plaintiff, and began to delay her payment for her Thermiva care work. Whenever Plaintiff would ask for her additional, off-the-record check, Defendant Blum would stall payment by saying he "had to check the account." Defendant Blum began to control Plaintiff financially as best he could.

52.     At no point during her employment for JFK Associates and Defendant Blum was she offered a contract for her work with Thermiva Care of New Jersey. Upon information and belief, Defendant Blum saw an opportunity to maximize Plaintiff's position with JFK to his benefit, all while controlling Plaintiff's schedule and finances.

53.     An example of Blum's efforts to manipulate and control Plaintiff related to her having trouble with her motor vehicle.

54.     Shortly after her employment began, Plaintiff's vehicle began to have transmission issues with her vehicle – an older Mazda.

55.     She brought this concern to Defendant Blum, informing him that because her principal form of transportation was having mechanical problems, she may not be able to continue to work for Defendants due to the expense and distance Plaintiff lived from the office at the time.

56.     Defendant Blum suggested that she have the vehicle repaired at his preferred mechanic and then offered to "lend" Plaintiff the quoted $3,000.00 to fix her vehicle to continue her employment at his office.

57.     Initially, Plaintiff denied the offer. However, Defendant Blum continuously pushed Plaintiff to accept, and ultimately, she relented and agreed.

58.     Once Plaintiff agreed, it became clear that Defendant Blum's offer was not an altruistic act, but yet another method to attempt to control Plaintiff.

59.     Indeed, Blum utilized his "loan" to further manipulate Plaintiff, including making disparaging or condescending remarks to Plaintiff.  Examples included telling Plaintiff, "I helped you before your own mother did" and "I want to be a father figure in your life, I don't have any children of my own."

60.     Because Plaintiff accepted her employer's financial help in a desperate time of need, Defendant Blum continued to feel empowered to control Plaintiff.

## PLAINTIFF SUFFERED HARASSMENT AND ASSAULT BY HER DIRECT SUPERVISOR

61.     After Plaintiff accepted Defendant Blum's financial assistance, it was clear that his intentions were only going to get stronger and less ethical.

62.     Defendant Blum became more eccentric in his actions and conduct towards Plaintiff creating a hostile work environment.

63.     Blum would make suggestive comments to Plaintiff, such as telling her when she would arrive for work that she looked "very exotic" if her hair was done in a certain way, and telling her that she "makes the office so stimulating."

64.     Occasionally throughout her employment, Plaintiff would express to Defendant Blum that she was experiencing stress from work and feeling extremely overwhelmed – largely due to the lack of assistance in the office, the hours being put in, the lack of pay, and the inappropriate nature of the comments and conduct of Blum.

65.     Plaintiff hoped that by expressing her concerns about the workplace, Defendant Blum would take appropriate action to employ more people at the office who could also be present when the harassing conduct took place.

66.     Instead, Defendant Blum saw it as an opportunity to attempt to further control Plaintiff.

67.     Indeed, rather than suggest that Plaintiff obtain proper medical care for her mental health issues, Defendant Blum "diagnosed" Plaintiff as suffering from major depression and anxiety and prescribed her anti-depression and anti-anxiety medications.

68.     Plaintiff, initially relying upon Defendant Blum's judgment, began to take one of the three prescribed medications (she filled the prescription on the second, but did not take it, and did not fill the prescription of the third). However, shortly thereafter, she realized she only felt worse. Plaintiff disclosed these feelings to Defendant Blum, who insisted she continue taking these medicines and did not recommend that she seek appropriate medical care from a trained mental health professional or psychiatrist – not from a general practitioner.

69.     On a daily basis, once arriving into the office in the morning, Defendant Blum would question Plaintiff with respect to whether she took the medication her prescribed for her.

70.     Plaintiff stopped taking the medication less than two weeks after the initial prescription, however told Defendant Blum she was still continuing to take the medication due to fear of retaliation.

71.     Defendant Blum commented on how he had seen a change in her mood, however Plaintiff was no longer taking these improperly prescribed medications.

72.     Because of Defendant's commentary, and knowing he was not a licensed psychiatrist, Plaintiff did not feel right taking a mixture of these medications.

73.     Plaintiff continued to have an overwhelming feeling that she was being taken advantage of and that Defendant Blum was trying to control her any way he could.

74.     On or about January 31, 2018, Plaintiff was working in the office along with Defendant Blum and, then co-worker, Rita Gomes.

75. Plaintiff began to experience stomach pain and asked Defendant Blum if she could go home and rest.

76. Instead of allowing Plaintiff to take a sick day, Defendant Blum insisted on examining her before making a decision on whether or not she could leave.

77. Defendant Blum directed Plaintiff to go into an exam room and put on a gown and take her pants off.

78. Reluctantly, Plaintiff did as she was told, with the hopes it would allow her to leave for the day like she requested.

79. After changing and laying down on the exam table, Plaintiff allowed Defendant access to the room. Defendant Blum began pushing on Plaintiff's stomach asking if it hurt. Plaintiff affirmed the stomach pain was on the lower right-hand side.

80. During the examination, Defendant Blum asked if Plaintiff felt any pain in her chest. Plaintiff denied any type of chest pains.

81. At this time, Defendant Blum grabbed Plaintiff's right breast from underneath her bra while she was laying down on the exam bed and began squeezing her breast in a sexual manner.

82. Plaintiff immediately stated she no longer needed Defendant Blum to continue his examination. Defendant Blum audibly chuckled and directed Plaintiff to go to the emergency room for an exam.

83. This touching of Plaintiff's breast by Blum was unwelcome without her permission and not for any legitimate purpose. Rather, Plaintiff believed that this was solely for Blum's own sexual gratification.

84. Plaintiff stated again she did not feel that was necessary to go to the emergency room and wanted to go home. However, Defendant Blum refused to allow her to leave work until

she agreed, and, at that time, Plaintiff wanted nothing more than to get away from Dr. Blum subsequent to this sexual assault.

85.    Prior to leaving, Plaintiff disclosed the events that occurred in the exam room to her co-worker, Rita Gomes.

86.    At the emergency room, Plaintiff was advised that there was nothing apparently wrong and that she needed to go home and rest.

87.    Plaintiff thereafter returned to the office and disclosed to Defendant Blum what the emergency room doctor told her.

88.    Defendant Blum grew increasingly angry that the emergency room did not perform any type of imaging on Plaintiff's stomach. He immediately wrote a "STAT" prescription and directed Plaintiff to leave work and go to Defendant JFK Hospital's Outpatient radiological clinic for imaging.

89.    After the testing was completed, Plaintiff again returned to work. By this point the workday was over and it was clear that Defendant Blum just wanted to be in control of everything Plaintiff did.

90.    On or about January 31, 2018, Plaintiff had sick, personal, and vacation time available.

91.    There was no reason, legitimate or otherwise, for Defendant Blum to deny Plaintiff the right to seek medical attention from her own doctor, be denied he ability to leave work early for medical purposes, and/or forced to be subjected to Defendant Blum's examination in which he sexually assaulted her.

92.    On or about February 23, 2018, Plaintiff's Administrator for JFK Associates, Jaimee Martucci, made a routine visit to Defendant Blum's office. Plaintiff and Martucci were the

only two people in the office at this time and Plaintiff began to open up about the events that had been transpiring within the office.

93.     It was Plaintiff's hope that through this confidential conversation, Martucci would be able to assist Plaintiff with the issues she was having with her work conditions, hours, pay change, alternating duties, off-the-record appointments and payments, amongst other things, including the hostile work environment that Defendant Blum had fostered and the assault that she suffered.

94.     While appearing sympathetic to Plaintiff's concerns, Martucci told her to reach out to Carol, Primecare's Accountant, at Defendant Sharma's office, because Martucci "could not get involved with office issues."

95.     Later that same day, Plaintiff called Defendant Sharma's office and had a conversation with their office manager, Lisa.

96.     Plaintiff called with the intention of asking for records of a mutual patient, however, still overwhelmed by her conversation with Martucci earlier and the sexual assault, Plaintiff told Lisa that she needed to have Carol call Defendant Blum's office as soon as possible.

97.     Plaintiff continued to unload her frustrations on the phone call with Lisa, eventually disclosing what happened in the exam room during office hours, *to wit*, the sexual assault.

98.     Carol called Plaintiff the same day and they discussed in more detail what type of events had been occurring in the office.

99.     Some examples include Plaintiff walking into Defendant Blum's office one day, during office hours, and seeing a pornography video paused on his computer, or how Defendant Blum would intentionally schedule Thermiva patients on office hours during lunch in order to prevent Plaintiff from taking her allotted breaks throughout the day.

100.    Plaintiff also disclosed that Defendant Blum would go back and add in notes to client's charts in order to 'cover the office' in case his prescribed treatment to the client resulted in negative side-effects or demise. Plaintiff specifically recalled and relayed a time that Defendant Blum added in a note to a male client's chart after he passed away, in order to cover the office in case the deceased's partner requested their medical records.

101.    Plaintiff also disclosed her discomfort about Defendant Blum seeing his ex-wife as a patient in the office, never billing her insurance for any visits, but often spending hours in an exam room with her. This meant that Plaintiff was unable to leave at the end of the workday because there was still a patient in the office, despite the patient's relationship to the Defendant.

102.    Instead of being offered a proper solution to the problems and issues Plaintiff brought up, Carol told Plaintiff that similar issues had taken place in the past with Defendant Blum.

103.    Rather than provide any corrective action or begin an investigation as to the legitimate complaints of Plaintiff, Carol merely suggested Plaintiff try to find a different job and stated that that Dr. Blum is an "odd person."

104.    Carol further mentioned that despite never meeting Plaintiff in person, she could make the assumption, based on previous complaints that she had received about Blum, that Plaintiff must be an "attractive, young girl."

105.    Carol mentioned to Plaintiff that she would speak to Dr. Sharma about Plaintiff's concerns.

106.    Several days after the phone call with Carol, Plaintiff arrived at work and noticed a complete change in energy – and not in a positive way.

107.    Plaintiff believed that something had been discussed with or disclosed to Defendant Blum from the main office.  However, no one followed up with Plaintiff regarding any type of conversations or warned her that a conversation would be forthcoming.

108.    Any conversations that were had with Defendant Blum proved worthless, however.

109.    In the winter of 2018, Defendant Blum called Plaintiff into his office on either Monday or Wednesday, because it was later in the day.

110.    Defendant Blum asked if Plaintiff was doing anything new lately. Plaintiff asked Defendant Blum what he was talking about.

111.    Defendant Blum went on to say that he saw Plaintiff and her boyfriend at the time on a website called "Chaturbate." Chaturbate, is an adult website providing live webcam performances by individual webcam models and couples, typically featuring nudity and sexual activity and is often highly explicit.

112.    Defendant Blum went on to say that he "never saw Christopher in person but knew he was African American and that the girl in the video looked like [Plaintiff]".

113.    Plaintiff denied the girl in the video was her and excused herself back to her desk embarrassed and incensed.

114.    Plaintiff was, in fact, performing on this website with her boyfriend in an effort to earn additional income.  She felt disgusted and humiliated that, not only had her boss watched her performing sexually on the internet, but that he had the audacity to discuss it with her as though there was no issue.

115.    Plaintiff went home after work and immediately blocked all United States viewers from her Chaturbate account and informed her then boyfriend what had happened at work.

116. The next day, Defendant Blum made a comment to Plaintiff, saying "I didn't see you online last night, so I watched an interracial porn video to get an idea of what it looked like watch you and your boyfriend having sex."

117. Due to the fact that Defendant Blum's behavior only seemed strengthened by his "conversation" with administration, it was clear to Plaintiff that if she went to those above her, nothing would be done about this hostile work environment.

118. Plaintiff began looking for a job immediately following this incident.

119. Plaintiff left her job with Defendant JFK Medical and Defendant Blum on March 31, 2019.

120. As a result of the conduct of the Defendants, Plaintiff has been harmed and damaged.

### FIRST CAUSE OF ACTION
**(Violations of the Fair Labor Standards Act – Failure to Pay Overtime)**
**(As to All Defendants)**

121. Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

122. Defendant wrongly classified Plaintiff as an exempt employee, when she was, in fact, non-exempt, and in an effort to avoid paying Plaintiff all wages which were due and owing including all overtime.

123. Defendants violated the FLSA by failing to compensate Plaintiff for all hours worked, each work week, including overtime as a non-exempt employee, and as earned, in violation of 29 U.S.C. §201, *et seq*.

124. Defendants' conduct and payroll practices, as described herein, were willful, intentional, unreasonable, arbitrary, and in bad faith.

125.     Defendant lost a significant amount of income by the change and misclassification of employment status.

126.     As a result of the conduct of these Defendants, Plaintiff has been harmed and damaged and are entitled to compensatory and liquidated damages, costs and attorneys' fees for all amounts unpaid along with injunctive relief barring any future conduct violative of the FLSA.

### SECOND CAUSE OF ACTION
**(Violations as to New Jersey Wage and Hour Law)**
**(As to All Defendants)**

127.     Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

128.     At all times relevant, Plaintiff was employed by Defendants within the meaning of the NJWHL.

129.     Defendants willfully violated Plaintiff's rights by unlawfully classifying her as an exempt employee and failing to pay her overtime compensation at rates not less than one and one-half her regular rate of pay for each hour worked in excess of forty hours in a work week.

130.     As a result of Defendants' violations of the NJWHL, Plaintiff has suffered damages in amounts to be determined at trial and are entitled to recovery of such amounts, prejudgment and post judgment interest, and reasonable attorney's fees and costs pursuant to the NJWHL.

### THIRD CAUSE OF ACTION
**(Sexual Harassment in Violation of the Law Against Discrimination)**
**(As to Defendant Blum)**

131.     Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

132.     During her employment she had been sexually harassed no less than four times.

133.     Pursuant to the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5-1, *et seq.* ("LAD"), Defendants are liable for the acts constituting hostile work environment sexual harassment created by the Defendant's employees, managers and/or supervisors.

134.     As set forth herein, Defendants created and perpetuated a severe and pervasive work environment based upon regular and continuous incidents involving Dr. Paul Blum, wherein Plaintiff was subjected to repeated and unwanted sexual advances, commentary, harassment, and physical assault during the course of her employment.

135.     Defendants failed to implement any preventative or remedial measures to protect against unlawful harassment, and discrimination, including but not limited to:

     a.  failure to institute or implement effective policies or procedures regarding gender and sexual harassment and the reporting and investigation of complaints of same;

     b.  failure to adequately monitor or supervise the illegal activities and discriminatory actions of supervisory personnel;

     c.  failure to provide adequate training to recognize, address, rectify and/or prevent illegal or discriminatory conduct; and

     d.  failure to adequately rectify, discipline or prevent known discriminatory conduct by supervisory personnel.

136.     The conduct engaged in by defendants constitutes egregious behavior and/or willful indifference by upper management to the rights of Plaintiff sufficient to subject Defendants to punitive damages under the LAD and *Lehmann v. Toys 'R' Us*.

137.     Plaintiff has been severely injured as a result of such harassment and discrimination that she has suffered, and continues to suffer, severe emotional distress, humiliation,

embarrassment, personal hardship, career and social disruption, psychological and emotional harm, economic losses, lost employment opportunities, and other such damages.

## FOURTH CAUSE OF ACTION
### (Sexual Assault in Violation of the Law Against Discrimination)
### As to Defendants Blum, JFK Associates and Primecare

138.    Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

139.    During Plaintiff's employment, she was physically assaulted by Defendant Blum when he grabbed her breast.

140.    Defendant Blum intended to cause harmful or offensive physical contact and Plaintiff was put in imminent apprehension of such conduct.

141.    This conduct constituted a harmful or offensive contact with Plaintiff, resulting from an act intended to cause Plaintiff to suffer the contact.

142.    As Defendant JFK Medical Associates and Primecare employed Dr. Blum at the time of the incident, they are vicariously liable for the assault and battery that Plaintiff was subjected to.

143.    Plaintiff has been severely injured as the result of such tortious conduct, and has suffered and continues to suffer emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, psychological and emotional harm, economic losses, lost employment opportunities, and other such damages.

## FIFTH COUNT
### (Aiding and Abetting Liability)
### Against Defendants JFK Associates and Primecare

144.    Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

145.     Defendants, by their actions and inactions, condoned, ratified, aided, and abetted the sexual harassment perpetrated against Plaintiff.

146.     Defendants had knowledge that the harassment was occurring, had knowledge that it was a violation of the law, and substantially encouraged and/or assisted in same.

147.     Defendants JFK Associates and Primecare are liable under the LAD for aiding and abetting hostile work environment sexual harassment, unlawful retaliation and/or assault and battery in violation of the LAD.

148.     The conduct engaged in by defendants constitutes egregious behavior and/or willful indifference by upper management by the rights of Plaintiff sufficient to subject defendants to punitive damages under the LAD.

149.     Plaintiff has severely injured as a result of such harassment that she has suffered, and continues to suffer emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, psychological and emotional harm, economic losses, loss employment opportunities, and other such damages.

## SIXTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### Against All Defendants

150.     Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

151.     New Jersey Law provides that every contract contain an implied covenant of good faith and fair dealing.

152.      Defendants were required to perform their agreement with Plaintiff in accordance with the implied covenant of good faith and fair dealing.

153.    The actions and conduct of the Defendants' constitute a breach of the implied covenant of good faith and fair dealing.

154.    As a result of the Defendants' conduct, Plaintiff has been harmed and damaged.

## SEVENTH CAUSE OF ACTION
### (Punitive Damages)
### As to All Defendants

155.    Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

156.    The conduct, as set forth in counts Three through Six, were done with actual malice, or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts and/or omissions.

157.    These Defendants knew, or should have known, at relevant times, that serious harm would arise from their conduct.

158.    Defendants were aware and recklessly disregarded the likelihood that the serious harm at issue would arise from their conduct.

159.    These Defendants continued the conduct as set forth above and did so until such time as Plaintiff was forced to quit her job due to the conduct as alleged herein.

160.    Plaintiff has been harmed and seriously damaged as a result of the conduct of these Defendants.

161.    Due to the facts alleged herein, under the New Jersey Punitive Damages Act, *N.J.S.A.* 2A:15-5.9-12, allows punitive damages to be awarded.

**WHEREFORE**, Allexis Licciardi respectfully requests that the Court enter judgment in his favor and against the Defendants, jointly and severally, as follows:

A.  Full compensation for back pay and benefits with full remuneration, with interest;

B. Full compensation for front pay and benefits with full remuneration, with interest;

C. An award of liquidated damages for all unpaid wages and/or overtime pursuant to the FLSA and NJWHL;

D. Compensatory damages;

E. Consequential damages;

F. Punitive damages;

G. Pre-judgment and post-judgment interest;

H. Attorneys' fees and costs with appropriate enhancement pursuant to the FLSA and NJWHL; and

I. Such other relief as may be available pursuant to the LAD in which this Court deems to be just and equitable.

## **JURY REQUEST**

Plaintiff demands a trial by jury.

## **LOCAL CIV. RULE 11.2 CERTIFICATION**

By signing below, counsel for Plaintiff confirms that the within matter in controversy is not the subject of any other action pending in any court or any other pending arbitration or administrative proceeding.

LURIE|STRUPINSKY, LLP
Attorneys for Plaintiff


By: _____
JOSHUA M. LURIE

DATED: January 24, 2020

## **VERIFICATION**

I, ALLEXIS LICCIARDI, of full age, verify that:

1. I am the Plaintiff in the within action.

2. I have reviewed the Verified Complaint and all facts therein.

3. I verify under the penalty of perjury that the facts as set forth in the Verified

   Complaint are true and correct to the best of my knowledge.

_____
ALLEXIS LICCIARDI

Dated: January ___, 2020

Plaintiff demands a trial by jury.

## LOCAL CIV. RULE 11.2 CERTIFICATION

By signing below, counsel for Plaintiff confirms that the within matter in controversy is not the subject of any other action pending in any court or any other pending arbitration or administrative proceeding.

LURIE|STRUPINSKY, LLP
Attorneys for Plaintiff

By: _____
JOSHUA M. LURIE

DATED: January 24, 2020

## VERIFICATION

I, ALLEXIS LICCIARDI, of full age, verify that:

1. I am the Plaintiff in the within action.

2. I have reviewed the Verified Complaint and all facts therein.

3. I verify under the penalty of perjury that the facts as set forth in the Verified Complaint are true and correct to the best of my knowledge.

_____
ALLEXIS LICCIARDI

Dated: January 24, 2020